# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In the Matter of:

**TELESOURCE SERVICES, LLC,**

      Debtor.

_____/

Case No. 15-45364
Chapter 11
Hon.

### COVER SHEET FOR FIRST DAY MOTION FOR ENTRY OF AN INTERIM AND FINAL ORDER AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, AUTHORIZING POST-PETITION SECURED SUPERPRIORITY FINANCING PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, AND 364, GRANTING ADEQUATE PROTECTION, AND SETTING A FINAL HEARING

The Debtor is filing a *First Day Motion for Entry of Interim and Final Order Authorizing the Debtor to Use Cash Collateral, Authorizing Post-Petition Secured Superpriority Financing pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364, Granting Adequate Protection, and Setting a Final Hearing* (the "Motion") to use cash collateral and to obtain postpetition financing, which is attached to this cover sheet. In accordance with LBR 4001-2(b) (E.D.M.), the Debtor has identified below, by page and paragraph number, the location in the proposed interim order accompanying the Motion of each of the following provisions:

| Provision | Contained in Proposed Order | Location in Proposed Order |
|---|---|---|
| (1) Provisions that grant liens on the estate's claims and causes of action arising under Chapter 5 of the Code. | _____ Yes<br><br>__X__ No | Page _____ , ¶ _____ |

| | | |
|---|---|---|
| (2) Provisions that grant cross-collateralization protection to the prepetition secured creditor (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the secured party's lien prepetition) other than liens granted solely as adequate protection against diminution in value of a prepetition creditor's collateral. | _____ Yes<br><br>__X__ No | Page _____, ¶ _____ |
| (3) Provisions that establish a procedure or conditions for relief from the automatic stay. | _____ Yes<br><br>__X__ No | Page _____, ¶ _____ |
| (4) Provisions regarding the validity or perfection of a secured creditor's prepetition liens or that release claims against a secured creditor. | _____ Yes<br><br>__X__ No | Page _____, ¶ _____ |
| (5) Provisions that prime any lien without that lienholder's consent. | __X__ Yes<br><br>_____ No | Page 4, ¶ 5 |
| (6) Provisions that relate to a sale of substantially all of the debtor's assets. | _____ Yes<br><br>__X__ No | Page _____, ¶ _____ |
| (7) Provisions for the payment of professional fees of the debtor or any committees, including any carve-outs for such payments. | __X__ Yes<br><br>_____ No | Page 5, ¶ 8 |
| (8) Provisions for the payment of prepetition debt. | _____ Yes<br><br>__X__ No | Page _____, ¶ _____ |
| (9) Provisions that waive the debtor's exclusive right to file or solicit acceptances of a plan during the time periods specified in 11 U.S.C. § 1121. | _____ Yes<br><br>__X__ No | Page _____, ¶ _____ |

| | | |
|---|---|---|
| (10) Provisions that require the debtor's plan to be on terms acceptable to the secured creditor. | _____ Yes<br><br>__X__ No | Page _____, ¶ _____ |
| (11) Provisions that require or prohibit specific terms in the debtor's plan. | _____ Yes<br><br>__X__ No | Page _____, ¶ _____ |
| (12) Provisions establishing that proposing a plan inconsistent with the order constitutes a default. | _____ Yes<br><br>__X__ No | Page _____, ¶ _____ |
| (13) Provisions that waive surcharge under 11 U.S.C. § 506(c). | _____ Yes<br><br>__X__ No | Page _____, ¶ _____ |
| (14) Provisions that address the rights and obligations of guarantors or co-obligors. | _____ Yes<br><br>__X__ No | Page _____, ¶ _____ |
| (15) Provisions that prohibit the debtor from seeking approval to use cash collateral without the secured creditor's consent. | _____ Yes<br><br>__X__ No | Page _____, ¶ _____ |
| (16) Provisions that purport to bind a subsequent trustee. | _____ Yes<br><br>__X__ No | Page _____, ¶ _____ |
| (17) Provisions that obligate the debtor to pay any of a secured creditor's professional fees. | __X__ Yes<br><br>_____ No | Page 3, ¶ 3 (**See DIP Agreement, sections 24.2 and 24.3.1**) |

Respectfully submitted,

SCHAFER AND WEINER, PLLC

By: /s/ Brendan G. Best
    BRENDAN G. BEST (P66370)
    JOHN J. STOCKDALE, JR. (P71561)

LEON N. MAYER (P54290)
Proposed Counsel for Debtor
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
bbest@schaferandweiner.com
(248) 540-3340

Dated: April 6, 2015

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In the Matter of:

Case No. 15-45364
**TELESOURCE SERVICES, LLC,**           Chapter 11

Hon.

Debtor.

_____/

## FIRST DAY MOTION FOR ENTRY OF AN INTERIM AND FINAL ORDER AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, AUTHORIZING POST-PETITION SECURED SUPERPRIORITY FINANCING PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, AND 364, GRANTING ADEQUATE PROTECTION, AND SETTING A FINAL HEARING

Telesource Services, LLC (the "Debtor"), by and through its proposed counsel, Schafer and Weiner, PLLC, for its *First Day Motion for Entry of Interim and Final Order Authorizing the Debtor to Use Cash Collateral, Authorizing Post-Petition Secured Superpriority Financing pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364, Granting Adequate Protection, and Setting a Final Hearing* (the "Motion") states:

## I.  GENERAL ALLEGATIONS

1.  On April 6, 2015 (the "Petition Date"), the Debtor filed its voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").[1]

2.  The Debtor is currently operating as debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3.  No official committee of unsecured creditors has been appointed in this case.

4.  Debtor filed this Motion pursuant to sections 105, 361, 362, 363 and 364 of the

---

[1] Unless otherwise stated, all section references herein are references to sections of the Bankruptcy Code.

Bankruptcy Code and Federal Rule Bankruptcy Procedure ("FRBP") 4001 and Local Rule 4001-2.

5.     This Court has jurisdiction over the matters relating to this Motion pursuant to 28 U.S.C. § 1334(a).

6.     This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(A), (D), (M) and (O).

7.     Venue of this proceeding in this district is appropriate under 28 U.S.C. §§ 1408 and 1409.

8.     For a detailed description of the Debtor, its finances and operations, and the reasons for this filing, see the *Declaration of Michael J. Woods in Support of Debtor's Chapter 11 Petition and First Day Pleadings* (the "Woods Declaration") filed concurrently with this Motion.

9.     The Woods Declaration states the facts upon which the Debtor relies in seeking the relief requested herein on an expedited basis, and states the amount of money needed to avoid immediate and irreparable harm, in compliance with Local Rule 4001-2(c)(6).

## II.     RELIEF REQUESTED

10.     Through this Motion, the Debtor requests entry of the proposed interim order substantially in the form attached hereto as **Exhibit 1** (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "Orders") (i) authorizing the Debtor to obtain post-petition financing and use cash collateral pursuant to sections 105(a), 361, 362, 363, and 364 of the Bankruptcy Code up to an aggregate principal amount of up to $750,000.00 from the DIP Lender, (ii) approving the terms of the Factoring and Security Agreement (the "DIP Agreement"), substantially in the form attached hereto as **Exhibit 2**, by and between the Debtor and Northwest Capital Investors, LLC (the "DIP Lender"), and any related documents required to be delivered by or in connection with the transaction contemplated by the DIP Agreement (the

"Factoring Facility") (any such related documents and the DIP Agreement are collectively the "DIP Loan Documents"), as modified by the Orders, (iii) granting security interests and priority liens to the DIP Lender pursuant to sections 364(c) and (d) of the Bankruptcy Code, and (iv) granting adequate protection pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code to the Debtor's prepetition secured lenders, and (iv) scheduling a final hearing (the "Final Hearing").

## III.  ARGUMENT

### A.  Secured Creditors Who May Have an Interest in Cash Collateral[2]

11.     Prior to the Petition Date, the Debtor obtained inventory and other goods from Mitel Networks, Inc. ("Mitel").  Upon information and belief, Mitel may assert a first position lien in all of the proceeds, accounts and contract rights pertaining to inventory the Debtor acquired from Mitel in the approximate amount of $1,934.

12.     Upon information and belief, The Huntington National Bank ("Huntington Bank") may assert a second position lien in all of the Debtor's assets in the approximate amount of $1,425,717 arising from a revolving line of credit loan and $1,687,830 arising from a term real estate loan.

13.     Upon information and belief, Strategic Funding Source, Inc. ("Strategic Funding") may assert a third position lien in all of the Debtor's assets, except for real state, in the approximate amount of $272,100.[3]

14.     The Debtor believes that besides Mitel, Huntington Bank and Strategic Funding

---

[2] Defined *infra.*
[3] Capital Quest, Inc. and Capitalist Crusade, LLC, together, wholly own the Debtor, and have also granted Strategic Funding a lien in all of their assets.  Both Capital Quest, Inc. and Capitalist Crusade, LLC are majority owned and controlled by Michael J. Woods, the CEO of the Debtor.

(collectively, the "Prepetition Secured Creditors") no other entities may assert secured claims in the Debtor's Cash Collateral (as defined below).

15.     The Debtor makes no admission and takes no position at this time regarding the validity, enforceability, priority or perfect of any of the obligations, security interests and liens that may be assert by the Prepetition Secured Creditors or any other secured or unsecured creditors of the Debtor, and reserves all of its rights in that regard.

16.     If the Debtor, during the course of this case and further investigation, discovers that any other entity may claim a security interest in the Cash Collateral, or that any Prepetition Secured Creditor is in fact not a secured creditor, the Debtor will supplement this Motion accordingly, and such entity or entities shall thereafter be included in, or excluded from, as the case may be, the definition of "Prepetition Secured Creditors" as used herein.

### B.     The DIP Loan

17.     As explained in the Woods Declaration, without a liquidity infusion the Debtor will be unable to meet its ongoing operating expenses, including payroll, causing immediate and irreparable harm to the Debtor, its estate, and its creditors.

18.     Understanding this potential harm to the Debtor, and prior to the decision to seek bankruptcy protection, the Debtor contacted Huntington Bank as well as other potential lenders to pursue various lending options that would give the Debtor sufficient liquidity to operate profitably. The Debtor was unable to reach an agreement with Huntington Bank that would have enabled the Debtor to either borrow, or to consent to the necessary lien waivers and subordinations necessary for the Debtor to obtain from a different lender, sufficient additional funds to continue to operate and restructure.

19.     When it was clear that the Debtor would need to borrow from a lender other than

Huntington Bank on debtor-in-possession terms, the Debtor obtained two other proposals from other lenders regarding a debtor-in-possession loan, to ensure that the DIP Agreement was the most favorable agreement available to the Debtor. The Debtor concluded in its business judgment that the DIP Agreement was the most favorable agreement and was most likely to lead to a funding, and furthermore could not identify any lender willing to lend as a debtor-in-possession lender under the Bankruptcy Code on an unsecured, administrative priority basis or secured by a junior lien on some or all of the Debtor's assets. In short, except for the Factoring Facility, the Debtor was unable to identify any other viable opportunity to obtain the financing necessary to effectively reorganize its Business.

20.     The Debtor and the DIP Lender, therefore, engaged in arm's length negotiations with respect to the terms and conditions of the DIP Agreement. Significantly, the DIP Agreement permits the DIP Lender to make available up to $750,000.00 (the "Ceiling Amount") in stages: (i) an emergency advance of approximately $500,000[4] to be made immediately upon entry of the Interim Order (the "Emergency Advance") sufficient to satisfy the initial expenses in the Budget, and (ii) subsequent advances as requested by Debtor and agreed to by Lender thereafter up to the Ceiling Amount (the "Later Advances" and together with the Emergency Advance and other indebtedness arising under the DIP Loan Documents, including interest and fees, shall be collectively referred to as the "Post-Petition Advances").

21.     Provided that a debtor's business judgment is not contrary to the provisions and underlying policies of the Bankruptcy Code, courts grant considerable deference to a debtor's business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr.

---

[4] The estimated amount of the Emergency Advance is $498,405, the net proceeds of the factoring of $623,000 of eligible receivables.

S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

22.     Furthermore, Section 364 does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming loan was necessary if debtor were to obtain funding).

23.     A concise summary of the terms of the DIP Loan is as follows:[5]

---

[5] The summaries and descriptions of the terms and conditions of the DIP Agreement and the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties-in-interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Agreement and the Interim Order. If there is a conflict between this Motion and the DIP Agreement or the Interim Order, the DIP Agreement or the Interim Order, as the case may be, shall control in all respects. If there is a conflict between the DIP Agreement and the Interim Order, the Interim Order shall control in all respects.

| OVERVIEW OF MATERIAL TERM | LOCATION IN DOCUMENT |
|---|---|
| The Debtor will be responsible to pay a Factoring Fee that is equal to 0.70% of the face amount of every purchased account for the first 10 days, plus 0.70% for every subsequent 10 day period until the face amount of the purchased account is paid to the Factor | Page 2 – 3 (definitions for "Factoring Fee", "Initial Factoring Fee", "Initial Periodic Factoring Fee Period", "Periodic Factoring Fee", "Periodic Factoring Fee Period", Periodic Factoring Fee Date"). Page 5, ¶ 4.1. |
| The Factoring Agreement is scheduled to terminate two years after the effective date or by order of the Bankruptcy Court, whichever occurs first. | Page 4 – (definition for "Scheduled Termination Date") |
| The following constitute events of default under the agreement: • Debtor defaults in the payment or performance obligations; • Debtor or a guarantor become subject to a debtor-relief proceeding; • Guarantor fails to perform or observe any obligations to Factor; • Any guaranty shall cease to be in full force and effect, or guarantor shall seek to rescind, modify, terminate or revoke a guaranty; and • Purchaser deems itself, in good faith, insecure with respect to the prospect of repayment or performance of the obligations. | Pages 9 - 10, ¶13.1 |
| The maximum credit facility available to the Debtor is $750,000.00. | Page 3 - (definition for "Maximum Amount") |
| The Factor is only authorized to purchase receivables offered by the Debtor. The Factor is only required to purchase receivables it deems to be eligible in its sole and absolute discretion. | Page 4, ¶ 2.1.1 and 2.1.3 |
| The DIP Lender is granted a lien on Debtor's property under 11 U.S.C. §364(c) | Page 6, ¶6.1 |
| The DIP Lender is granted a lien on property under 11 U.S.C. §364(d) | Page 6, ¶6.1 |

### C.     The Budget

24.     The Debtor prepared a thirteen week cash flow estimate and other financial projections (the "Budget," a copy of which is attached as **Exhibit 3**), projecting the Debtor's

anticipated revenue and expenses and demonstrates the amount of funds the Debtor must borrow and expend over a 13 week period.[6] The Budget may be updated by the Debtor during the pendency of this case, and the Debtor shall use its Cash Collateral and the Post-Petition Advances in accordance with the Budget for payment of, among other things, (i) post-petition operating expenses and other working capital needs, (ii) the Adequate Protection Payment and fees, costs, and expenses associated with the Factoring Facility, and (iii) other costs and expenses of administration of this case.

25. During the first 4 weeks of this case, to avoid immediate and irreparable harm the Debtor projects that it will need to borrow approximately $500,000 of DIP funds and spend approximately $1,000,000 of Factoring Facility proceeds and Cash Collateral.

26. The Debtor requests authority to spend that amount in accordance with the Budget with a twenty (20%) percent variance for each line item, and a ten (10%) percent variance in aggregate.

### D.     DIP Priming Lien

27. As security for the full and timely payment of the obligations arising under the DIP Loan Documents (the "Post-Petition Obligations"), the Debtor requests that the DIP Lender be granted (collectively, the "DIP Liens"): (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority senior security interest in and lien upon all pre-petition and post-petition property of the Debtor (the "Collateral") that is not subject to valid, perfected, and unavoidable liens of the Prepetition Secured Creditors, *excluding* proceeds of property received with respect to the estate's claims and causes of action arising under chapter 5 of the Bankruptcy Code, and (ii) pursuant to

---

[6] Note that the Budget estimates that Debtor's cash needs based on a projection, relying in part on projected sales. Therefore, the Debtor's actual performance may vary from the projections in the Budget, depending on the Debtor's actual sales as well as other variables.

section 364(d)(1) of the Bankruptcy Code, first priority, senior, priming security interest in and liens upon all Collateral that is subject to valid, perfected, and unavoidable liens of the Prepetition Secured Creditors, excluding that certain vehicle encumbered by a lien by Mercedes Benz Financial Service.[7]

### E.    Adequate Protection

28.     Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, after notice and hearing, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

29.     Furthermore, Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code lists various types of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361.

30.     What constitutes adequate protection must be decided on a case-by-case basis. *See MNBank Dallas, NA v. O'Connor In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987); *Martin v. U.S. (In re Martin)*, 761 F.2d 472 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The purpose of the requirement is to protect a secured creditor from the diminution in value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 554 (3d Cir. 1994) ("The whole purpose of adequate

---

[7] For clarify, upon information and belief Mercedes Benz Financial Service does not have an interest in Cash Collateral, and is secured only by title on a vehicle.

protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

31.     The Debtor submits that the Prepetition Secured Creditors' interest in the Collateral, including the Cash Collateral, is adequately protected to the extent required by the Bankruptcy Code, pursuant to sections 361 and 363(e) as a result of the Adequate Protection Payment, the Replacement Liens, and/or the equity in the Debtor's assets preserved and enhanced by the DIP Loan, as further set forth below.

32.     Adequate Protection Payment.  As adequate protection for Huntington Bank, the Debtor proposes to continue to pay Huntington Bank its monthly payments of $15,970 on the line of credit and $20,347 on the real estate term loan.[8]

33.     Replacement Liens.  As adequate protection to protect the Prepetition Secured Creditors against the diminution in value of their interests in the pre-petition Collateral resulting from both the Debtor's use of the Cash Collateral and from the grant of the DIP Liens, the Debtor will grant each Prepetition Secured Creditors, only to the extent of any diminution in value of any pre-petition Collateral that such Prepetition Secured Creditor holds a perfected, valid, enforceable, unavoidable pre-petition lien or security interest, a lien on any of the Debtor's assets which are created, acquired, or arise after the Petition Date, but limited to only those types and descriptions of Collateral in which the Prepetition Secured Creditors holds a perfected, valid, enforceable, unavoidable pre-petition lien or security interest (the "Replacement Liens").  The Replacement Liens shall have the same priority and validity as each Secured Creditor's pre-petition security interests and liens, except that the Replacement Liens will be junior to the DIP Liens.

---

[8] Debtor reserves all rights with respect to the application of the Adequate Protection Payment.

34.    Equity in Assets is Preserved and Enhanced.  The Debtor estimates[9] that the value

of its assets are:

| | |
|---|---|
| Cash | $34,144.00 |
| Accounts Receivable[10] | $1,159,346.00 |
| Inventory[11, 12] | $606,493.00 |
| Machinery & Equipment[13] + Other Assets | $1,494,657.00 |
| Real Estate[14] | $915,000.00 |
| **Total** | **$4,209,640.00** |

35.    The Debtor estimates that the amount of its secured debts[15] are:

| | |
|---|---|
| Huntington Bank-Line of Credit | $1,425,717.00 |
| Strategic Funding | $272,100.00 |
| Huntington Bank- Real Estate Mortgage | $1,687,830.00 |
| Mercedes Benz Financial Services | $106,044.00 |
| **Total** | **$3,491,691.00** |

36.    Therefore, based on the Debtor's estimates of its asset values, prior to the approval

and funding of the DIP Loans, the Debtor estimates that as of the filing date, an estimated equity

cushion exists for the Secured Creditors with a purported interest in the Cash Collateral in the

amount of $717,949.

37.    Upon the funding of the DIP Loan, the equity cushion will be reduced by the

amount of the $623,000 of receivables factored by the priming Emergency Advance, *i.e.* to

---

[9] The Debtor reserves all of its rights with respect to any estimated values of its assets stated herein.  The Debtor is continuing to investigate the value of its assets, and the information set forth herein is without prejudice in that regard, and is not an admission in any way.

[10]Accounts receivable is composed of: $682,352 of current accounts and $476,994 of past due accounts.

[11] Inventory is composed of: $406,739 of finished goods, $135,000 of components, and $65,754 of work-in-progress.

[12] As summarized, Debtor believes that its cash, accounts receivable, and inventory (the "Cash Collateral") has an aggregate value, as of March 30, 2013, of $1,800,983

[13] This value is based on appraised fair market value as of January, 2012.  The Debtor may have acquired additional machinery and equipment since that time, and the value of the machinery and equipment may have also changed since 2012.

[14] The Debtor's real estate is the land and building located at 1450 Highwood East, Pontiac, Michigan from which it operates.  The value is based on the Debtor's net book value.  The Real Estate's appraised fair market value, pursuant to an appraisal done on October 29, 2014 is $915,000.

[15] The Mitel alleged secured claim is disregarded, as it will be reduced to zero as and when it receives an product on the Debtor's floor, in the ordinary course of business.

approximately $95,000, still leaving the Pre-Petition Secured Creditors with a modest equity cushion, which is projected to increase substantially, as explained below and as demonstrated in the Budget.

38.     The Emergency Advance, which will prime the existing Collateral as further described above at paragraph 27, and therefore temporarily reduced the equity cushion, are anticipated to be paid off in full by week 11 through the collection of the factored receivables. The Emergency Advance will allow the Debtor to fulfill outstanding purchase orders that the Debtor has previously lacked the cash to fill. The Debtor projects that after the Emergency Advance and the Later Advance,[16] as shown in the Budget, the Debtor will have resolved its liquidity problem, and on a go-forward basis will be operating cash flow positive. Therefore, by the end of week 12, the Debtor projects that its Accounts Receivable balance will be approximately $802,456, with cash of $484,960, and will no longer have any outstanding indebtedness to the DIP Lender that would otherwise prime the Pre-Petition Secured Creditors. Therefore, by week 12, the Pre-Petition Secured Creditors are projected to have adequate liquidity as well as a substantial equity cushion in the amount of approximately $811,875, actually increasing the equity cushion from the Petition Date by $93,926.

39.     This equity cushion alone may be sufficient adequate protection under Section 361 of the Bankruptcy Code. *See, e.g., In re Mr. D Realty Co.*, 27 B.R. 359, 364-365 (Bankr. S.D. Ohio 1983) (The existence of an equity cushion as a method of adequate protection is the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court, and it has been widely accepted that an equity cushion created by the excess of security over debt can itself constitute adequate protection).

---

[16] The Debtor reserves its right, and is seeking the authority, to request additional Later Advances if required, notwithstanding anything contained herein or in the Budget.

### F.     Additional Relief Requested

40.     The Debtor expects to incur allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) and allowed fees and expenses incurred by professionals it retains pursuant to section 327 of the Bankruptcy Code ("Retained Professionals"). First from the proceeds of the Post-Petition Advances, and then from Cash Collateral, the Debtor requests the authority to fund (i) statutory fees of the United States Trustee and (ii) a professional fee escrow in the amount of $45,000.00 per month, which shall be used exclusively for the purpose of paying any portion of the allowed administrative expenses of the Retained Professionals and to the extent not so required shall also be deemed Collateral.[17]

### G.     Conclusion

41.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court can conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

42.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtor requests that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtor to factor up to $623,000 of its accounts receivable under the DIP Agreement, resulting in a borrowing of approximately $500,000, on an interim basis, pending entry of the Final Order, in order to (i) maintain and finance the Debtor's ongoing operations, and (ii) avoid immediate and irreparable harm and prejudice to Debtor's estate and all parties-in-interest and (b) schedule the Final Hearing.

43.     To implement the foregoing, the Debtor seeks a waiver of the notice requirements

---

[17] The Budget provides for a $25,000 escrow payment to Debtor's counsel and $20,000 to Debtor's financial advisor.

under Bankruptcy Rule 6004(a) and the ten (10) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

44.     The Debtor shall provide notice of this Motion to: (i) the Office of the United States Trustee for the Eastern District of Michigan (the "U.S. Trustee"); (ii) the Prepetition Secured Creditors; (iii) the DIP Lender; (iv) creditors holding the 20 largest unsecured claims against the Debtor as identified in the Debtor's chapter 11 petition pursuant to Bankruptcy Rule 1007(d); (v) all parties entitled to notice under FRBP 4001(d)(1)(C), and (vi) upon all parties that have requested service via the Court's ECF system. In light of the nature of the relief requested, the Debtor submits that no other or further notice is necessary.

45.     The Debtor is only seeking to allow the Debtor to use the Cash Collateral on an interim basis to pay its necessary operating expenses (as outlined in the Budget) until the Court holds a final hearing on the Debtor's use of Cash Collateral. To the extent that no parties object to the order authorizing Debtor's use of Cash Collateral after service of the order, the Debtor proposes that the interim order will become a final order authorizing the use of Debtor's Cash Collateral going forward.

**WHEREFORE**, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit 1** granting the relief requested herein and granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

SCHAFER AND WEINER, PLLC

By: /s/ Brendan G. Best
         BRENDAN G. BEST  (P66370)
         JOHN J. STOCKDALE, JR. (P71561)
         LEON N. MAYER (P54290)
         Proposed Counsel for Debtor
         40950 Woodward Ave., Ste. 100
         Bloomfield Hills, MI 48304 (248) 540-3340

Dated: April 6, 2015                    <u>bbest@schaferandweiner.com</u>

**EXHIBIT 1**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In the Matter of:

**TELESOURCE SERVICES, LLC,**

Debtor.

Case No. 15-45364
Chapter 11
Hon.

_____/

**INTERIM ORDER AUTHORIZING THE DEBTOR TO USE CASH**
**COLLATERAL, AUTHORIZING POST-PETITION SECURED**
**SUPERPRIORITY FINANCING PURSUANT TO BANKRUPTCY CODE**
**SECTIONS 105, 361, 362, 363, AND 364, GRANTING ADEQUATE**
**PROTECTION, AND SETTING A FINAL HEARING**

Upon consideration of the *First Day Motion for Entry of Interim and Final Order Authorizing the Debtor to Use Cash Collateral, Authorizing Post-Petition Secured Superpriority Financing pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364, Granting Adequate Protection, and Setting a Final Hearing* (the "Motion");[18] and upon consideration of the *Declaration of Michael J. Woods in Support of Debtor's Chapter 11 Petition and First Day Pleadings* (the "Woods Declaration"); and the Court having jurisdiction under sections 157 and 1334 of title 28 of the United States Code to consider the Motion and the relief requested therein; and venue being proper in this Court under sections 1408 and 1409 of title 28 of the United States Code; and this matter being a core proceeding within the meaning of section 157 of title 28 of the United States Code; and the Court having determined that the relief sought in the Motion is in the best interest of the Debtor, its creditors, and all parties-in-interest; and the Court having determined that notice was properly given under the circumstances; the Court having reviewed the Motion, and the Court

---

[18] Capitalized terms used, but not defined, herein shall have the meanings as set forth in the Motion.

having heard the sufficient evidence and statements of counsel regarding the Motion and having determined that the legal and factual bases set forth in the Motion and attested to in the Woods Declaration establish just cause for the relief granted herein, therefore:

**THE COURT HEREBY FINDS:**

A.      On April 6, 2015 (the "Petition Date"), Debtor filed for relief under Chapter 11 of Title 11 the United States Code (the "Bankruptcy Code").

B.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

C.      The Court consideration of this Motion constitutes a core proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D), (M) and (O).

D.      The procedures set forth in this Order, constitute sufficient "notice and hearing" under section 102 and 363(c) of the Bankruptcy Code, Bankruptcy Rule 2002, 4001, 6004 and 9006. This Order is being entered on an interim basis pursuant to Bankruptcy Rule 4001 and is expressly subject to the rights of parties-in-interest to object as specifically provided in paragraph 12 below.

E.      The Debtor requires funds to pay expenses in connection with maintaining operations, including purchasing services, supplies and material, satisfying taxes, payroll, and fringe benefits for employees and paying utilities. Failure to pay these and similar critical expenses would cause the Debtor immediate and irreparable harm by disrupting the Debtor's ability to maintain its operations and shutting down the Debtor's business.

F.      The Debtor does not have sufficient unencumbered funds to meet these expenses. Accordingly, the Debtor requires authorization to use cash collateral to avoid immediate and irreparable harm. The amount of cash the Debtor proposes to use before entry of a final order granting the Motion (including adequate protection payments as authorized under this Order) is

set forth in the Budget attached to the Motion. Specifically, during the first four weeks of this case, the Debtor requires the use of $1,000,000 to avoid immediate and irreparable harm.

G.      The Debtor also does not have sufficient funds, whether encumbered or not encumbered, to meet these expenses. Accordingly, the Debtor requires authorization to borrow additional funds to avoid immediate and irreparable harm. The amount of cash the Debtor proposes to borrow, by factoring before entry of a final order granting the Motion is set forth in the Budget attached to the Motion. Specifically, during the first four weeks of this case, the Debtor must borrow, by factoring $623,000 of receivables, approximately $500,000 to avoid immediate and irreparable harm.

H.      The legal and factual bases set forth in the Motion and attested to in the Woods Declaration establish just cause for the relief granted herein.

Therefore, **IT IS HEREBY ORDERED** that:

1.      The Motion is granted.

2.      The Debtor is authorized to borrow the DIP Loan, use Cash Collateral and grant adequate protection in accordance with the terms of the Motion, and such authority shall continue until further order of this Court.

3.      The DIP Loan Documents, substantially in the form as attached to the Motion, are hereby approved.

4.      To avoid immediate and irreparable harm before the date of the final hearing or the date this Order becomes a final order in the absence of a timely objection and final hearing, Debtor is permitted to borrow approximately $500,000 and use Cash Collateral in the amount of $1,000,000, and the Debtor's authorized borrowing and use of Cash Collateral is limited to those amounts prior to the entry of a final order or the time this Order becomes a final order, as the case

may be, and may be used according to the Budget and the Motion. The Debtor is furthermore authorized to spend such amounts in accordance with the Budget with a twenty (20%) percent variance for each line item, and a ten (10%) percent variance in aggregate.

5. As security for the full and timely payment of the Emergency Advance (and, upon this order becoming a final order, all Post-Petition Obligations), the DIP Lender is hereby granted (collectively, the "DIP Liens"): (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority senior security interest in and lien upon all pre-petition and post-petition property of the Debtor (the "Collateral") that is not subject to valid, perfected, and unavoidable liens of the Prepetition Secured Creditors, *excluding* proceeds of property received with respect to the estate's claims and causes of action arising under chapter 5 of the Bankruptcy Code, and (ii) pursuant to section 364(d)(1) of the Bankruptcy Code, first priority, senior, priming security interest in and liens upon all Collateral that is subject to valid, perfected, and unavoidable liens of the Prepetition Secured Creditors, excluding that certain vehicle encumbered by a lien by Mercedes Benz Financial Service.

6. As adequate protection to protect the Prepetition Secured Creditors against the diminution in value of their interests in the pre-petition Collateral resulting from both the Debtor's use of the Cash Collateral and from the grant of the DIP Liens, the Debtor will grant each Prepetition Secured Creditors, only to the extent of any diminution in value of any pre-petition Collateral that such Prepetition Secured Creditor holds a perfected, valid, enforceable, unavoidable pre-petition lien or security interest, a lien on any of the Debtor's assets which are created, acquired, or arise after the Petition Date, but limited to only those types and descriptions of Collateral in which the Prepetition Secured Creditors holds a perfected, valid, enforceable, unavoidable pre-petition lien or security interest (the "Replacement Liens"). The Replacement

Liens shall have the same priority and validity as each Secured Creditor's pre-petition security interests and liens, except that the Replacement Liens will be junior to the DIP Liens.

7.     As additional adequate protection, the Debtor shall continue to make monthly payments to Huntington Bank of $15,970 on the line of credit and $20,347 on the real estate term loan.

8.     Debtor shall timely satisfy all quarterly fees pursuant to 28 U.S.C. § 1930(a)(6). Debtor is authorized to pay, first from the proceeds of the Post-Petition Advances, and then from Cash Collateral, a professional fee escrow in the amount of $45,000.00 per month to professionals it retains pursuant to section 327 of the Bankruptcy Code ("Retained Professionals"), to be held in trust by the Retained Professionals, which shall be used exclusively for the purpose of satisfying any portion of the allowed claims of the Retained Professionals, and to the extent not so required shall also be deemed Collateral.

9.     Nothing in this Order constitutes an admission by the Debtor or prejudices the rights of the Debtor to challenge the amount, validity, enforceability, priority or perfection of any liens or security interests asserted by any alleged secured creditors, or the allocation of the payments provided herein, on any basis or bases whatsoever.

10.    The Debtor shall, within twenty-four (24) hours following the entry of this order, serve copies of this order and the Debtor's Motion on each of the Debtor's 20 largest unsecured creditors, all the secured creditors, any committee formed in this case, the United States Trustee's Office, and all other parties who are required to be served under FRBP 4001(d).

11.    The Debtor is authorized to escrow Professional Fees, as more fully set forth in the Motion. The first escrow payment shall take place no later than April 10, 2015 and on the tenth of each month thereafter.

12.     All parties seeking to object to this Order must file a written objection within fourteen (14) days after the entry of this Order, except that an official committee may file objections within fourteen (14) days after the official committee is served with the entered Order. If an objection is timely filed, the final hearing on this Order will be held before the Honorable Judge _____, United States Bankruptcy Judge, 211 W. Fort Street, Courtroom _____, on _____, _____ ___, 2015 at __:00 _.m. If no timely objection is filed, then this Order will become a final order without a further hearing, and the Debtor will be authorized to spend for those expenses referenced in the Motion, as well as any other expenses necessary for operating the business in the ordinary course of its business.

13.     The Debtor shall pay quarterly fees to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a).

**EXHIBIT 2**

DIP AGREEMENT

# FACTORING AND SECURITY AGREEMENT

THIS FACTORING AND SECURITY AGREEMENT ("Agreement") is made as of April ____, 2015 ("Effective Date"), by and between Telesource Services, LLC ("Seller") and Northwest Capital Investors, LLC, or assigns ("Purchaser").

1. **Definitions**. The following terms used herein shall have the following meaning. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code in effect in the Chosen State.

**"Account"** - any invoice, invoice receivable, purchase order, written statement or itemized statement showing details of a sale or purchase transaction, or any other evidence of indebtedness.

**"Avoidance Claim"** - any claim that any payment received by Purchaser from or for the account of an Account Debtor is avoidable under the Bankruptcy Code or any other debtor relief statute.

**"Chosen State**: - Ohio.

**"Clearance Days"** - (i) 3 business days for checks drawn on banks located within the state in which Purchaser has its principal place of business, and for all electronic funds transfers, and (ii) 3 business days for all other payments.

**"Closed"** - a Purchased Account is closed upon the first to occur of (i) receipt of full payment by Purchaser or (ii) the unpaid Face Amount has been charged to the Reserve Account by Purchaser pursuant to the terms hereof.

**"Collateral"** - any collateral now or hereafter described in any form UCC-1 filed against Seller naming Purchaser as the secured party, including but not limited to all of Seller's right, title and interest in and to the following property, now owned and hereafter acquired:

All accounts (including accounts purchased by Purchaser hereunder and repurchased by Seller), chattel paper, general intangibles, including, but not limited to, tax refunds, registered and unregistered patents, trademarks, service marks, copyrights, trade names, trade secrets, customer lists, licenses, documents, instruments, deposit accounts, certificates of deposit, and all rights of Seller as a seller of goods, including rights of reclamation, replevin and stoppage in transit;

All goods, including, but not limited to the following:

All inventory, wherever located;

All equipment and fixtures, wherever located, and all additions, substitutions, replacements (including spare parts), and accessions thereof and thereto; and

All books and records relating to all of the foregoing property and interests in property, including, without limitation, all computer programs, printed output and computer readable data in the possession or control of the Seller, any computer service bureau or other third party;

All investment property; and

All proceeds of the foregoing, including, but not limited to, all insurance proceeds, all claims against third parties for loss or destruction of or damage to any of the foregoing, and all income from the lease or rental of any of the foregoing.

**"Early Termination Fee"** – an amount equal to (i) the average monthly revenue earned by Purchaser from Seller for the two (2) full months immediately preceding Seller's termination of this Agreement multiplied by (ii) the number of months, including the month of termination, remaining until the Scheduled Termination Date.

**"Eligible Account"** - an Account which is acceptable for purchase as determined by Purchaser in the exercise of its sole credit or business judgment.

**"Events of Default"** - See Section 13.1.

**"Face Amount"** - the face amount due on an Account at the time of Purchase.

**"Factoring Fee"** - the aggregate amount of all fees paid or to be paid by Seller to Purchaser with respect to a Purchased Account. This includes the Initial Factoring Fee for the Initial Factoring Period which shall be calculated by multiplying the Face Amount of the Purchased Account by the Initial Factoring Fee. It also includes each subsequent Periodic Factoring Fee for each Periodic Factoring Fee Period thereafter which shall be calculated by multiplying the Periodic Factoring Fee by the Face Amount of the Purchased Account. The Factoring Fee shall be computed from the date on which a Purchased Account was purchased and shall be calculated to and including the Late Payment date or the date such Purchased Account becomes a Repurchased Account, whichever first occurs. Notwithstanding anything contained herein to the contrary, a Factoring Fee shall be paid for each Factoring Fee Period during which a Purchased Account is owned by the Purchaser, even if such Purchased Account is owned by the Purchaser beyond the Late Payment Date, and such Factoring Fees shall be in addition to any and all Late Charges.

**"Initial Factoring Fee"** – 0.7%

**"Initial Factoring Fee Period"** - up to 10 days following the Purchase Date.

**"Invoice"** - the document that evidences an Account. Where the context so requires, reference to an Invoice shall be deemed to refer to the Account to which it relates.

**"Late Charge"** – 0.7 % every 10 days commencing on the Late Payment Date.

**"Late Payment Date"** - the date which is 90 days following the Purchase Date.

**"Maximum Amount"** - $750,000.00.

**"Misdirected Payment Fee"** - fifteen percent (15%) of the amount of any payment on account of a Purchased Account which has been received by Seller and not delivered in kind to Purchaser on the next business day following the date of receipt by Seller.

**"Obligations"** - all present and future obligations owing by Seller to Purchaser whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising before, during or after the commencement of any Bankruptcy Case in which Seller is a Debtor, including but not limited to any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations.

**"Parties"** - Seller and Purchaser.

**"Periodic Factoring Fee** – 0.7% every Periodic Factoring Fee Period.

**"Periodic Factoring Fee Period"** - up to each 10-day period commencing on the Periodic Factoring Fee Date.

**"Periodic Factoring Fee Date"** - the date which is 10 days following the Initial Factoring Fee Period.

**"Purchase Date"** - the date on which Seller has been advised in writing that Purchaser has agreed to purchase an Account from Seller.

**"Purchase Price"** - the Face Amount.

**"Purchased Accounts"** - Accounts purchased hereunder which have not been repurchased.

**"Repurchased"** - an Account has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount.

**"Required Reserve Amount"** - the Reserve Percentage multiplied by the unpaid balance of Purchased Accounts.

**"Reserve Account"** - a bookkeeping account on the books of the Purchaser representing an unpaid portion of the Purchase Price, maintained by Purchaser to ensure Seller's performance with the provisions hereof.

**"Reserve Percentage"** - 20%.

"**Reserve Shortfall**" - the amount by which the Reserve Account is less than the Required Reserve Amount.

"**Schedule of Accounts**" - a form supplied by Purchaser from time to time wherein Seller lists its Accounts or a copy(ies) of the actual Account(s) it requests that Purchaser purchase under the terms of this Agreement.

"**Scheduled Termination Date**" – two years after the Effective Date or by Bankruptcy Court order, whichever is first.

"**Seller's Account**" - any demand deposit account maintained by Seller, or represented by an employee of Seller to be maintained by Seller.

2. **Sale; Purchase Price; Billing; Reserve**

2.1. **Assignment and Sale**.

2.1.1. Subject to Section 2.1.3, Seller shall sell to Purchaser as absolute owner, with full recourse, such of Seller's Accounts as are or may be listed or included from time to time on the Schedule of Accounts.

2.1.2. Each Schedule of Accounts shall be accompanied by such documentation supporting and evidencing the Account as Purchaser shall from time to time request.

2.1.3. Purchaser shall purchase from Seller such Accounts as Purchaser determines to be Eligible Accounts, so long as the unpaid balance of Purchased Accounts does not exceed, before and after such purchase, the Maximum Amount. Purchaser's determination of which Accounts are Eligible Accounts to be purchased hereunder and whether the unpaid balance of Purchased Accounts can or may exceed, before and after such purchase, the Maximum Amount, shall be made at Purchaser's sole discretion.

2.1.4. Purchaser shall pay the Purchase Price, less any amounts due to Purchaser from Seller, including, without limitation, any amounts due under Section 2.3.2 hereof, of any Purchased Account, to Seller's Account within two (2) business days of the Purchase Date, whereupon the Accounts shall be deemed purchased hereunder.

2.2. **Billing**. Purchaser may send a monthly statement to all Account Debtors itemizing their account activity during the preceding billing period. All Account Debtors will be instructed to make payments to Purchaser.

2.3. **Reserve Account**.

2.3.1. Purchaser may apply a portion of any Purchase Price to any Reserve Shortfall.

2.3.2. Seller shall pay to Purchaser on demand the amount of any Reserve Shortfall.

2.3.3. Purchaser shall pay to Seller upon Seller's request, any amount by which the then-existing balance of the Reserve Account is greater than the Required Reserve Amount; provided that Seller shall be entitled to make such demand not more than twice in any one (1) month.

2.3.4. Purchaser may charge the Reserve Account with any Obligation, including any amounts due from Seller to Purchaser hereunder.

2.3.5. Purchaser may pay any amounts due Seller hereunder by a credit to the Reserve Account.

2.3.6. Upon termination of this agreement, Purchaser may retain the Reserve Account for ninety days thereafter to be applied to payment of any Obligations that were unknown to Purchaser at the time of termination.

3. **Authorization for Purchases**. Subject to the terms and conditions of this Agreement, Purchaser is authorized to purchase Accounts upon telephonic, facsimile or other instructions received from anyone purporting to be an officer, employee or representative of Seller.

4. **Fees and Expenses**. Seller shall pay to Purchaser:

4.1. **Fees**. The Initial Factoring Fee and the Periodic Factoring Fee on the date on which a Purchased Account is closed.

4.2. **Misdirected Payment Fee**. Any Misdirected Payment Fee immediately upon its accrual.

4.3. **Late Charge**. The Late Charge on:

4.3.1. All past due amounts due from Seller to Purchaser hereunder; and

4.3.2. The amount of any Reserve Shortfall.

4.4. **Administration Fee.** Each schedule of accounts processed, regardless of the number of invoices assigned, shall be subject to an administration fee of $25.00 payable by Seller to Purchaser and deducted from the purchase price by Purchaser to Seller.

4.5. **Out-of-pocket Expenses**. The out-of-pocket expenses directly incurred by Purchaser in the administration of this Agreement such as wire transfer fees, postage and audit fees, shall be paid by Seller to Purchaser on demand, and may at Purchaser's election be credited against the Reserve Account.

4.6 **Early Termination Charges.** The Early Termination Fee, payable on demand, in the event Seller terminates this Agreement prior to the Scheduled Termination Date.

4.6 **Closing Fee**. 2% of the Maximum Amount credit limit.

5. **Repurchase Of Accounts**. Purchaser may require that Seller repurchase, by payment of the then unpaid Face Amount thereof, together with any unpaid fees relating to the Purchased Account on demand, or, at Purchaser's option, by Purchaser's charge to the Reserve Account in the event any of the following occur:

5.1. Any Purchased Account, the payment of which has been disputed by the Account Debtor obligated thereon, Purchaser being under no obligation to determine the bona fides of such dispute;

5.2. Any Purchased Account for which Seller has breached any warranty under Section 12 hereunder;

5.3. All Purchased Accounts upon the occurrence of an Event of Default, or upon the termination date of this Agreement;

5.4. Any Purchased Account which remains unpaid beyond the Late Payment Date;

5.5. Any Purchased Account which Purchaser determines at any time in its sole discretion is no longer an Eligible Account, and

5.6. Any Purchased Account, the payment of which has been made by the Account Debtor obligated thereon, by check bearing a restrictive endorsement such as "Paid in Full", when in fact the Purchased Account has not been fully paid. Moreover, Purchaser shall have no liability to Seller for the difference in the amount owed and the amount paid should such a check be deposited.

6. **Security Interest**.

6.1. As collateral securing the Obligations, Seller grants to Purchaser a continuing first priority security interest in and to the Collateral.

6.2. Notwithstanding the creation of the above security interest, the relationship of the parties shall be that of Purchaser and Seller of accounts, and not that of lender and borrower.

6.3 Purchaser shall have the right to take possession and dispose of any collateral at either private or public sale without judicial process after default. Purchaser shall notify the Seller of any such private or public sale in accordance with §9-504 of the Uniform Commercial Code, or corresponding law of the Chosen State, at least twenty-four hours prior to the sale in the form and matter described in Section 29 hereof. Seller hereby agrees consents and acknowledges that such notification is reasonable as to the time and place of any public or private sale or other intended disposition of the collateral.

6.4. Clearance Days. For all purposes under this Agreement, and notwithstanding anything contained herein to the contrary, Clearance Days will be added to the date on which any payment is to be received by Purchaser.

7. **Authorization to Purchaser**.

7.1. Seller hereby irrevocably authorizes Purchaser, its successors and assigns, at Seller's expense, to exercise at any time any of the following powers until all of the Obligations have been paid in full: (a) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof, (b) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon the accounts and other Collateral, (c) after an Event of Default, change the address for delivery of mail to Seller and to receive and open mail addressed to Seller, (d) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all accounts or other Collateral which includes a monetary obligation and discharge or release any account debtor or other obligor (including filing of any public record releasing any lien granted to Seller by such account debtor), without affecting any of the Obligations, (e) execute in the name of Seller and file against Seller in favor of Purchaser financing statements or amendments with respect to the Collateral, (f) pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in the Collateral, which sums shall be included as Obligations hereunder, and in connection with which sums the Late Charge shall accrue and shall be due and payable, (g) file in the name of Seller or Purchaser or both, (1) mechanics lien or related notices or (2) claims under any payment bond, in connection with goods or services sold by Seller in connection with the improvement of realty, and (h) notify any Account Debtor obligated with respect to any Account, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser.

7.2. Seller hereby releases and exculpates Purchaser, its officers, employees and designees, successors and assigns, from any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. In no event will Purchaser have any liability to Seller for lost profits or other special or consequential damages. Without limiting the generality of the foregoing, Seller releases Purchaser from any claims which Seller may now or hereafter have arising out of Purchaser's endorsement and deposit of checks issued by Seller's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account.

7.3. Seller authorizes Purchaser to accept, indorse and deposit on behalf of Seller any checks tendered by an account debtor "in full payment" of its obligation to Seller. Seller shall not assert against Purchaser any claim arising there from, irrespective of whether such action by Purchaser effects an accord and satisfaction of Seller's claims, under §3-311 of the Uniform Commercial Code, or otherwise.

8. **ACH Authorization.** In order to satisfy any of the Obligations, Purchaser is hereby authorized by Seller to initiate electronic debit or credit entries through the ACH system to Seller's Account or any other deposit account maintained by Seller wherever located.

9. **Covenants by Seller**.

9.1. Seller shall not, without the prior written consent of Purchaser in each instance, (a) grant any extension of time for payment of any of the accounts or any other Collateral which includes a monetary obligation, (b) compromise or settle any of the accounts or any such other Collateral for less than the full amount thereof, (c) release in whole or in part any account debtor or other person liable for the payment of any of the accounts or any such other Collateral, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the accounts or any such other Collateral.

9.2. From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts there from as Purchaser may request. Without expense to Purchaser, Purchaser may use any of Seller's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller.

9.3. Before sending any Invoice to an Account Debtor, Seller shall mark same with a notice of assignment as may be required by Purchaser.

9.4. Seller shall pay when due all payroll and other taxes, and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require.

9.5. Seller shall not create, incur, assume or permit to exist any lien upon or with respect to any Collateral now owned or hereafter acquired by Seller.

9.6. Seller shall maintain insurance on all insurable property owned or leased by Seller in the manner, to the extent and against at least such risks (in any event, including but not limited to fire and business interruption insurance) as usually maintained by owners of similar businesses and properties in similar geographic areas. All such insurance shall be in amounts and form and with insurance companies acceptable to Purchaser in its sole discretion. Seller shall furnish to Purchaser: (a) upon written request, any and all information concerning such insurance carried; (b) as requested by Purchaser, lender loss payable endorsements (or their equivalent) in favor of Purchaser. All policies of insurance shall provide for not less than thirty- (30) day's prior written cancellation notice to Purchaser.

9.7. Notwithstanding that Seller has agreed to pay the Misdirected Payment Fee pursuant to Section 4.2 hereof, Seller shall deliver in kind to Purchaser on the next banking day following the date of receipt by Seller of the amount of any payment on account of a Purchased Account.

9.8. Seller shall indemnify Purchaser from any loss arising out of the assertion of any Avoidance Claim. Seller shall notify Purchaser within two business days of it becoming aware of the assertion of an Avoidance Claim.

10. **Account Disputes**. Seller shall notify Purchaser promptly of and, if requested by Purchaser, will settle all disputes concerning any Purchased Account, at Seller's sole cost and expense. However, Seller shall not, without Purchaser's prior written consent, compromise or adjust any Purchased Account or grant any additional discounts, allowances or credits thereon. Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the dispute upon such terms as Purchaser in its sole discretion deem advisable, for Seller's account and risk and at Seller's sole expense. Upon the occurrence of an Event of Default Purchaser may resolve such issues with respect to any Account of Seller.

11. **Perfection of Security Interest**. Seller shall execute and deliver to Purchaser such documents and instruments, including, without limitation, Uniform Commercial Code financing statements, as Purchaser may request from time to time in order to evidence and perfect its security interest in any collateral securing the Obligations.

12. **Representation and Warranty**. Seller represents and warrants that:

12.1. It is fully authorized to enter into this Agreement and to perform hereunder;

12.2. This Agreement constitutes its legal, valid and binding obligation; and

12.3. **As to Accounts**. The Purchased Accounts (i) are and will remain bona fide existing obligations created by the sale and delivery of goods or the rendition of services in the ordinary course of Seller's business, (ii) are unconditionally owed to Seller without defenses, disputes, offsets, counterclaims, or rights of return or cancellation, (iii) Purchaser has not received notice of actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of any applicable account debtor regarding Purchased Accounts.

13. **Default.**

13.1. **Events of Default**. The following events will constitute an Event of Default hereunder: (a) Seller defaults in the payment of any Obligations or in the performance of provision hereof or of any other agreement now or hereafter entered into with Purchaser, or any warranty or representation contained herein proves to be false in any way, howsoever minor, (b) Seller or any guarantor of the Obligations becomes subject to any debtor-relief proceedings, (c) any such guarantor fails to perform or observe any of such Guarantor's Obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of

the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, (d) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations.

**13.2. WAIVER OF NOTICE. SELLER WAIVES ANY REQUIREMENT THAT PURCHASER INFORM SELLER BY AFFIRMATIVE ACT OR OTHERWISE OF ANY ACCELERATION OF SELLER'S OBLIGATIONS HEREUNDER. FURTHER, PURCHASER'S FAILURE TO CHARGE OR ACCRUE INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY PURCHASER OF ITS CLAIM THERETO.**

13.3. **Effect of Default**.

13.3.1. Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations shall immediately become due and payable without notice.

13.3.2. The Late Charge shall accrue and is payable on demand on any Obligation not paid when due.

14. **Account Stated**. Purchaser shall render to Seller a statement setting forth the transactions arising hereunder. Each statement shall be considered correct and binding upon Seller as an account stated, except to the extent that Purchaser receives, within thirty (30) days after the mailing of such statement, written notice from Seller of any specific exceptions by Seller to that statement, and then it shall be binding against Seller as to any items to which it has not objected.

15. **Waiver**. No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which Purchaser may have, nor shall any such delay be construed to be a waiver of any of such rights, powers, or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver by Purchaser of any breach or default by Seller hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to Purchaser hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies that Purchaser would otherwise have. Any waiver, permit, consent or approval by Purchaser of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

16. **Termination; Effective Date**. This Agreement will be effective when accepted by Purchaser and will continue in full force and effect until the Scheduled Termination Date and shall be further annually extended automatically thereafter. Seller or Purchaser may terminate this Agreement prior to the Scheduled Termination Date at any time upon thirty (30) days notice.

Upon termination by Seller prior to the Scheduled Termination Date, Seller shall pay the Obligations to Purchaser, including the Early Termination Fee, if applicable.

17. **Amendment**. Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by all parties to this Agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

18. **No Lien Termination without Release**. In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any terminations or satisfactions of any of Purchaser's liens on the Collateral unless and until Seller has executed and delivered to Purchaser a general release in a form reasonably satisfactory to Purchaser. Seller understands that this provision constitutes a waiver of its rights under §9-404 of the UCC.

19. **Conflict**. Unless otherwise expressly stated in any other agreement between Purchaser and Seller, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement, the provisions of this Agreement shall control.

20. **Survival**. All representations, warranties and agreements herein contained shall be effective so long as any portion of this Agreement remains executory.

21. **Severability**. In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

22. **Enforcement**. This Agreement and all agreements relating to the subject matter hereof is the product of negotiation and preparation by and among each party and its respective attorneys, and shall be construed accordingly.

23. **Relationship of Parties**. The relationship of the parties hereto shall be that of Seller and Purchaser of accounts, and neither party is or shall be deemed a fiduciary of or to the other.

24. **Attorneys Fees**. Seller agrees to reimburse Purchaser on demand for:

24.1. The actual amount of all costs and expenses, including attorneys' fees, which Purchaser has incurred or may incur in:

24.1.1. Negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith, all of which shall be paid contemporaneously with the execution hereof;

24.1.2. Any way arising out of this Agreement;

24.1.3. protecting, preserving or enforcing any lien, security interest or other right granted by Seller to Purchaser or arising under applicable law, whether or not suit is brought, including but not limited to the defense of any Avoidance Claims;

24.2. the actual costs, including photocopying (which, if performed by Purchaser's employees, shall be at the rate of $.10/page), travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Seller is a party;

24.3. Either (the choice of which shall be in the sole discretion of Purchaser):

24.3.1. The actual amount of all costs and expenses, including attorneys' fees, which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Seller, including those (i) arising out the automatic stay, (ii) seeking dismissal or conversion of the bankruptcy proceeding or (ii) opposing confirmation of Seller's plan thereunder.

24.3.2. 20% of the amount of the claim of Purchaser against Seller, which Seller agrees shall constitute a reasonable substitute for such actual fees and expenses. Any such costs and expenses incurred after the execution hereof shall become part of the Obligations when incurred and may be added to the outstanding principal amount due hereunder.

25. **Entire Agreement**. This Agreement supersedes all other agreements and understandings between the parties hereto, verbal or written, express or implied, relating to the subject matter hereof. No promises of any kind have been made by Purchaser or any third party to induce Seller to execute this Agreement. No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

26. **Choice of Law**. This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Chosen State.

27. **JURY TRIAL WAIVER**. **IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN**

**WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

28. **Venue; Jurisdiction.** The parties agree that any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance or breach of this Agreement, shall, if Purchaser so elects, be instituted in the United States District Court for the Western Division of the Northern District of Ohio, or any state of municipal court located in Lucas County, Toledo, Ohio, or any other court in the Chosen State as may be determined by Purchaser in its sole discretion (the "Acceptable Forums"). Each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the Chosen State or otherwise in those courts in any such suit, action or proceeding. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Purchaser as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

29. **Notice.**

29.1. All notices required to be given to any party other than Purchaser shall be deemed given upon the first to occur of (i) deposit thereof in a receptacle under the control of the United States Postal Service, (ii) transmittal by electronic means to a receiver under the control of such party; or (iii) actual receipt by such party or an employee or agent of such party.

29.2. All notices to Purchaser hereunder shall be deemed given upon actual receipt by a responsible officer of Purchaser.

29.3. For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate:

|  |  |
|---|---|
| SELLER: | TELESOURCE SERVICES, LLC |
| Address: | 1450 Highwood East |
|  | Pontiac, Michigan 48340 |
| Officer: | Michael J. Woods |
| Fax Number: | 248-335-8983 |
| E-mail: | mwoods@tsrc.com |
| PURCHASER: | NORTHWEST CAPITAL INVESTORS, LLC |
| Address: | 7644 King's Pointe Road |
|  | Toledo Ohio 43617 |
| Member: | Jim DelVerne |

| Fax Number: | 419-885-0600 |
| E-mail: | jdelverne@northwestcap.com |

30. **Counterparts**. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

31. **Bankruptcy Court**. This Agreement shall be subject to, and to the extent inconsistent with, shall be governed by, any interim and final orders of the Bankruptcy Court in the case of *In re Telesource Services, LLC* approving this Agreement, notwithstanding anything herein to the contrary.

32. **Confession of Judgment.** If Seller fails to pay all or part of any Obligation when due, whether by acceleration or otherwise, Seller hereby authorizes any attorney-at-law to appear in any court of record in the State of Ohio after any Obligation under this Factoring and Security Agreement becomes due and payable, and to waive the issuing and service of process and all other constitutional rights to due process of law, to enter an appearance, to confess a judgment against Seller in favor of Purchaser for the amount then appearing due together with costs of suit, and thereupon to release all errors and waive all rights of appeal and stays of execution. Seller voluntarily and knowingly waives all rights to notice and hearing prior to judgment being confessed against Seller, if Seller should default under the terms hereof.

*(signatures on following page)*

**WARNING - BY SIGNING THIS PAPER, YOU GIVE UP YOUR RIGHT TO NOTICE AND COURT TRIAL. IF YOU DO NOT PAY ON TIME, A COURT JUDGMENT MAY BE TAKEN AGAINST YOU WITHOUT YOUR PRIOR KNOWLEDGE AND THE POWERS OF A COURT CAN BE USED TO COLLECT FROM YOU REGARDLESS OF ANY CLAIMS YOU MAY HAVE AGAINST THE CREDITOR, WHETHER FOR RETURNED GOODS, FAULTY GOODS, FAILURE ON HIS PART TO COMPLY WITH THE AGREEMENT, OR ANY OTHER CAUSE.**

IN WITNESS WHEREOF, the Parties have executed this agreement on the day and year first above written.

SELLER:                    TELESOURCE SERVICES, LLC


By: _____
Name:  Michael J. Woods
Title:    President / CEO


PURCHASER:                 NORTHWEST CAPITAL INVESTORS, LLC


By: _____
Name:  Jim DelVerne
Title:  Member

# CLIENT GUARANTY

To induce Northwest Capital Investors, LLC, an Ohio limited liability company, or assigns, with offices at 7644 King's Pointe Drive, Toledo, Ohio 43617 ("NWCI") to enter into a Factoring and Security Agreement ("Agreement") dated April ____, 2015 by and between NWCI and Telesource Services, LLC, with offices at 1450 Highwood East, Pontiac, Michigan 48340 ("Client"), and in consideration thereof and of any financial accommodations heretofore or hereafter granted by NWCI to or for the account of Client, whether pursuant to said Agreement or otherwise, it is hereby agreed by Michael J. Woods ("Guarantor") as follows:

1.      Guarantor hereby irrevocably and unconditionally guaranties to NWCI, its successors and assigns, the full payment and performance of all of the obligations and indebtedness of Client to NWCI under the Agreement, as and when the same shall be due and payable, whether by lapse of time, acceleration, or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees to NWCI, its successors and assigns, that he is liable to NWCI for the full payment and performance of all of the obligations and indebtedness owed by the Client to NWCI, and that he shall pay each and every such indebtedness and obligation in accordance with the terms set forth in the Agreement.

2.      Guarantor hereby guarantees the validity of, and the full and faithful performance by Client of, all the Client's warranties, representations and obligations pursuant to the Agreement and he also hereby guarantees payment to NWCI of all debts, liabilities, damages, losses, fees or any other amounts due, or which might become due, to NWCI arising from any breach or violations by Client of any of its said warranties, representations and obligations as set forth in the Agreement or if any of the same are invalid.

3.      Guarantor agrees to indemnify NWCI and hold it harmless against all obligations, demands and liabilities by whomsoever asserted, and against all losses in any way suffered, incurred or paid by NWCI as a result of or in any way arising out of, or following, or consequential to transactions with the Client, whether under the Agreement or otherwise. In addition to the foregoing, Guarantor shall be liable to NWCI for reasonable attorneys' fees if any claim hereunder or under the Agreement is referred to any attorney for collection.

4.      Guarantor agrees that this Guaranty shall not be impaired by any assignment, modification, supplement, extension or amendment to which the parties to the Agreement may hereafter agree nor by any modification, release or other alteration of any of the obligations hereby guaranteed or of any security therefore, to all of which the Guarantor hereby consents.

5.      Guarantor acknowledges that his liability hereunder is direct and unconditional, and may be enforced without requiring NWCI first to resort to any other right, remedy or security and that this Guaranty shall continue in full force and effect until expressly terminated by giving NWCI sixty (60) days' prior written notice by registered or certified mail and that such termination shall be applicable only to transactions having their inception after the effective date of termination and shall not affect rights and obligations arising out of transactions having their inception prior to such date.

6. Guarantor agrees that all present and future debts and obligations of the Client to each Guarantor are hereby waived and postponed in favor of and subordinate to the full payment and performance of all present and future obligations of the Client to NWCI.

7. Guarantor agrees that if the Client or any Guarantor should at any time become insolvent or make a general assignment, or if a petition in bankruptcy or any insolvency or reorganization proceedings shall be filed or commenced by, against or in respect of the Client or any Guarantor, any and all obligations of each Guarantor shall, at the option of NWCI, forthwith become due and payable without notice.

8. Guarantor waives notice of acceptance hereof, and presentment and protest any instrument, and notice thereof. Guarantor further waives notice of default and all other notices to which they might otherwise be entitled.

9. This Guaranty, all acts and transactions hereunder, and the rights and obligations of the parties hereto shall be governed, construed and interpreted according to the laws of the State of Ohio, shall be binding upon the heirs, executors, administrators, successors and assigns of Guarantor and shall inure to the benefit of, and shall be severally enforceable by, NWCI, its successors, assigns, subsidiaries and/or parent corporations.

10. Guarantor hereby agrees, acknowledges and hereby consents to the (i) assignment by NWCI of any and all of its rights and interest in the Agreement and of this Client Guaranty of Validity, and each of the documents and agreements executed and delivered by Client in connection therewith and herewith and (ii) the assignment by NWCI of any or all of its rights and interests in any Purchase Receivables (as defined in the Agreement), including but not limited to, any security interest therein and all UCC financing statements executed in connection therewith, to any lending institution with which NWCI has or may have a relationship.

11. In the event any one or more of the provisions contained in this Client Guaranty is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

12. Guarantor hereby authorizes any attorney-at-law to appear in any court of record in the State of Ohio after any Obligation or indebtedness under the Agreement becomes due and payable, and to waive the issuing and service of process and all other constitutional rights to due process of law, to enter an appearance, to confess a judgment against Guarantor in favor of NWCI for the amount then appearing due together with costs of suit, and thereupon to release all errors and waive all rights of appeal and stays of execution. Guarantor voluntarily and knowingly waives all rights to notice and hearing prior to judgment being confessed against Guarantor.

**WARNING - BY SIGNING THIS PAPER, YOU GIVE UP YOUR RIGHT TO NOTICE AND COURT TRIAL. IF YOU DO NOT PAY ON TIME, A COURT JUDGMENT MAY BE TAKEN AGAINST YOU WITHOUT YOUR PRIOR KNOWLEDGE AND THE POWERS OF A COURT CAN BE USED TO COLLECT FROM YOU REGARDLESS OF ANY CLAIMS YOU MAY HAVE AGAINST THE CREDITOR, WHETHER FOR RETURNED GOODS, FAULTY GOODS, FAILURE ON HIS PART TO COMPLY WITH THE AGREEMENT, OR ANY OTHER CAUSE.**

GUARANTOR:

Dated:_____          _____
                               Michael J. Woods

**EXHIBIT 3**

BUDGET

| Period beginning April 6, 2015 Weeks Beginning | Week 1 6-Apr | Week 2 13-Apr | Week 3 20-Apr | Week 4 27-Apr | Week 5 4-May | Week 6 11-May | Week 7 18-May | Week 8 25-May | Week 9 1-Jun | Week 10 8-Jun | Week 11 15-Jun | Week 12 22-Jun | Week 13 29-Jun | 13-WEEK TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | |
| Beginning Cash Balance | $ 5,800 | $ 430,239 | $ 324,644 | $ 173,589 | $ 141,020 | $ 6,074 | $ 134,070 | $ 200,067 | $ 86,317 | $ 69,853 | $ 172,558 | $ 301,847 | $ 484,960 | |
| **CASH IN** | | | | | | | | | | | | | | |
| A/R – DIP Collateral [1] | $ 498,405 | $ - | $ - | $ - | $ 165,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 663,405 |
| A/R – DIP Holdback Remittance [2] | - | 20,767 | 20,767 | 20,767 | 20,767 | 27,642 | 27,642 | 6,875 | 6,875 | 6,875 | 6,875 | | | 165,851 |
| A/R – Non-DIP Collateral [3]  $ 536,117 | 240,753 | 105,077 | 63,931 | 50,665 | 41,522 | 4,199 | 3,392 | 4,762 | 3,974 | | | | | 518,275 |
| Projected A/R – Hardware (Resale) [4] | - | - | - | - | - | 265,787 | 135,992 | 122,052 | 189,071 | 112,192 | 277,262 | 242,437 | 103,394 | 1,448,184 |
| Projected A/R – Repair Services [5] | - | - | 46,070 | 60,278 | 57,600 | 55,633 | 72,263 | 76,791 | 105,570 | 65,463 | 65,267 | 59,500 | 59,500 | 723,934 |
| Freight Revenue [6] | - | - | - | - | - | 9,545 | 9,545 | 9,545 | 9,545 | 9,545 | 9,545 | 9,545 | 9,545 | 76,360 |
| Tax Credit Proceeds [12] | - | - | - | - | - | - | 63,176 | - | - | - | - | - | - | 63,176 |
| **Total Cash In** | $ 739,157 | $ 125,844 | $ 130,768 | $ 131,710 | $ 284,890 | $ 362,804 | $ 312,009 | $ 220,024 | $ 315,035 | $ 194,074 | $ 358,949 | $ 311,482 | $ 172,439 | $ 3,659,185 |
| **CASH OUT** | | | | | | | | | | | | | | |
| DIP Loan Fees | $ 15,000 | $ 2,442 | $ 2,442 | $ 2,442 | $ 2,442 | $ 3,251 | $ 3,251 | $ 809 | $ 809 | $ 809 | $ 809 | | | 34,504 |
| Pre-Petition Employee Benefits | - | 9,130 | - | - | - | - | - | - | - | - | - | | | 9,130 |
| Projected A/P – Trade [7] | 94,978 | 86,686 | 124,038 | 83,625 | 177,211 | 162,504 | 77,527 | 268,081 | 66,174 | 66,174 | 66,174 | 113,969 | 113,969 | 1,501,111 |
| HB LOC- Term Payment [8] | 15,970 | - | - | - | 15,970 | - | - | - | 15,970 | - | - | - | 15,970 | 63,881 |
| HB – Mortgage [8] | 20,347 | - | - | - | 20,347 | - | - | - | 20,347 | - | - | - | 20,347 | 81,386 |
| Other Bank Fees [9] | - | - | - | 4,800 | - | - | - | 4,800 | - | - | - | - | 4,800 | 14,400 |
| Payroll [10] | 135,000 | - | 147,285 | - | 157,285 | - | 157,285 | - | 157,285 | - | 157,285 | - | 157,285 | 1,068,710 |
| 401k | - | 6,836 | - | 6,836 | - | 7,500 | - | 7,500 | - | 7,500 | - | 7,500 | - | 43,672 |
| Health Benefits [11] | - | 64,133 | - | 64,133 | - | - | - | - | 25,000 | - | - | - | 25,000 | 178,266 |
| Insurance (Various) | - | 7,646 | 5,000 | 2,000 | - | 7,646 | 5,000 | 2,000 | - | 7,646 | - | 5,000 | 2,000 | 43,938 |
| Utilities/Water/Waste | 1,700 | 8,900 | 4,100 | 500 | 2,300 | 9,700 | 5,200 | 500 | - | 9,700 | 5,200 | 500 | - | 48,300 |
| Office Supplies | - | 1,000 | 1,400 | - | - | - | 1,000 | 1,400 | - | - | 1,000 | 1,400 | - | 7,200 |
| Rent (Bensenville) [12] | - | 47,108 | - | - | - | 47,108 | - | - | 47,108 | - | - | - | 47,108 | 188,432 |
| Other Non-Trade Disb. | 1,723 | - | - | 2,385 | 1,723 | 350 | - | 2,385 | 1,723 | 350 | - | - | 2,385 | 13,023 |
| Professional / UST Fees | 45,000 | - | - | - | 45,000 | - | - | - | 45,000 | - | - | - | 50,000 | 185,000 |
| **Total Cash Out** | $ 314,718 | $ 231,439 | $ 281,823 | $ 164,279 | $ 419,836 | $ 234,808 | $ 246,012 | $ 333,774 | $ 331,499 | $ 91,370 | $ 229,654 | $ 128,369 | $ 438,864 | $ 3,446,450 |
| **NET CASH FLOW** | $ 424,439 | $ (105,595) | $ (151,055) | $ (32,569) | $ (134,947) | $ 127,996 | $ 65,997 | $ (113,750) | $ (16,464) | $ 102,704 | $ 129,290 | $ 183,113 | $ (266,425) | 212,735 |
| **Ending Cash Balance** | $ 430,239 | $ 324,644 | $ 173,589 | $ 141,020 | $ 6,074 | $ 134,070 | $ 200,067 | $ 86,317 | $ 69,853 | $ 172,558 | $ 301,847 | $ 484,960 | $ 218,535 | |

| ADEQUATE PROTECTION | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A/R – DIP Collateral | 498,405 | - | - | - | 165,000 | - | - | - | - | - | - | - | - | - |
| A/R – Non-DIP Collateral | 295,364 | 190,287 | 126,356 | 75,691 | 34,169 | 29,970 | 26,578 | 21,816 | 17,842 | 17,842 | 17,842 | 17,842 | 17,842 | |
| | | | | | | | | | | | | | | |
| Beginning AR Post Petition | - | 321,402 | 527,216 | 670,343 | 864,313 | 835,712 | 868,345 | 1,008,098 | 978,112 | 1,191,076 | 1,157,921 | 959,893 | 802,456 | |
| Plus: Sales | 321,402 | 205,814 | 189,197 | 254,248 | 193,999 | 363,597 | 357,552 | 178,402 | 517,149 | 154,045 | 154,045 | 154,045 | 239,045 | |
| Less: Receipts | - | - | (46,070) | (60,278) | (57,600) | (330,964) | (217,799) | (208,387) | (304,186) | (187,199) | (352,074) | (311,482) | (172,439) | |
| Less: New DIP Collateral | - | - | - | - | (165,000) | | | | | | | | | |
| AR - Post-Petition (cumulative) | 321,402 | 527,216 | 670,343 | 864,313 | 835,712 | 868,345 | 1,008,098 | 978,112 | 1,191,076 | 1,157,921 | 959,893 | 802,456 | 869,062 | |

**Notes:**

1. Assumes DIP lending on $623,000 of accounts receivable at an 80% advance rate, which is consistent with the current term sheet and proposal offered from Northwest Capital.
2. Assumes collection for the 20% of accounts receivable heldback (80% advance rate) at the time of the DIP loan to occur evenly over a 6 week period.
3. Non-DIP collateral as of the filing date totals $536,117. The weekly amounts represent collections against that gross amount.
4. Projected hardware (resale) receipts assume collections begin 35 to 40 days from the time of sale.
5. Repair (services) receipts assume collections begin 15 days from time services are rendered.
6. Assumes freight margins are consistent with the average over the last 2 fiscal years of 15%. For revenue for prior sales is included in existing accounts receivable. As such, new freight revenue collections are assumed to start with the collection period associated with new sales.
6. Existing A/P reflects no further stretching of trade creditors.
7. The projected cost of all future sales assumes 100% of purchases are on a COD basis.
8. Represent adequate protection payment consistent with current due dates for the monthly loan payments.
9. Other bank fees represent monthly banking charges and merchant service fees.
10. Payroll increases are commensurate with increased sales levels over prior periods as sales employees are compensated on a commission basis.
11. Health care savings of approximately $40,000 per month will be realized starting in June 2015 as the Company is moving it's employees to the federal health care exchange.
12. As of March 31, 2015, the Company is two months behind on its rent for the Bensenville facility in Illinois. The cash flow assumes all future rent payments are made timely.
    Additionally, the Company recently received an $85,000 sales and use tax credit for which it will attempt to use as barter with its Bensenville facility landlord for payments.
    If an agreement is not reached with the landlord, the tax credit can be fully realized in the future or sold in the open market at a discount to generate additional cash flow.
    Management has agreed to liquidate the tax credit at a discount by week 7 if no agreement has been reached with the Bensenville landlord. The assumed discount rate is at 75%.