UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In the Matter of:

**TELESOURCE SERVICES, LLC,**

Debtor.

_____/

Case No. 15-45364
Chapter 11
Hon.

## DECLARATION OF MICHAEL J. WOODS
## IN SUPPORT OF FIRST DAY PLEADINGS

In support of the above-captioned Debtor's chapter 11 petition and its First Day Motions, I, Michael J. Woods, declare as follows:

1. Except as otherwise stated herein, I make this declaration upon personal knowledge and if called as a witness, could competently testify to the facts contained herein.

2. I am the Chief Executive Officer of the Debtor and indirectly[1] own and control 72% of the Debtor.

3. The Debtor filed a voluntary petition for relief (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on April 6, 2015 (the "Petition Date") in the Bankruptcy Court.

4. The Debtor continues to operate its business and manage its assets as a debtor-in-possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.[2] I have been informed

---

[1] The Debtor is directly owned as follows: (i) 60% by Capitalist Quest, Inc., which is in turn owned 72% by me, 18% by Peter Bonde, my cousin and an employee of the Debtor, and 10% by Chris Bonde, also my cousin and also an employee of the Debtor; and (ii) 40% by Capitalist Crusade, LLC, which in turn is owned in the same proportion as Capitalist Quest, Inc. by the same individuals.

[2] Unless otherwise noted to the contrary, all section references herein are references to sections of the Bankruptcy Code.

by counsel that no request has been made for the appointment of a trustee or examiner, and no official committee has been appointed to date by the office of the United States Trustee.

5. This Declaration describes the business of the Debtor, the circumstances surrounding the commencement of Debtor's Chapter 11 Case, and relevant facts for the purposes of supporting the First Day Motions. Nothing herein is intended to be or should be construed as an admission of the validity of claims, security interests, liens, contractual defaults or any other rights or interests that may be asserted against any Debtor. The statements made herein regarding debts, obligations, defaults, and liens represent only assertions made by creditors of the Debtor or that the Debtor anticipates will be made by creditors and does not constitute a belief on the part of the Debtor that these assertions are true and/or accurate.

## BACKGROUND

### THE DEBTOR'S BUSINESS

6. Since 1979, Telesource has been a world leader in the resale, remanufacture, repair, and reengineering of circuit board based technology. The company's list of customers includes end-users and commercial customers alike, including Fortune 1000 companies, small-to-large businesses, government agencies, municipalities, hospitals, educational facilities, RBOCs, interconnects, OEMS and dealers throughout the world.

7. The company is a TL 9000 and ISO 9001 registered company, a GSA contract holder, a long-standing member of the North American Association of Telecommunications Dealers, a member of UNEDA, and the past recipient of Verizon's "Repair Vendor of the Year Award", having achieved one of the lowest "out of box" failure rates in the world.

8. The company maintains its headquarters in Pontiac, Michigan and a repair/assembly facility in the Metropolitan Chicago area.

## EVENTS LEADING TO BANKRUPTCY

9. The company began experiencing cash flow problems in or around 2013. During 2014, the company maintained sales volumes and implemented certain operational changes that resulted in cost savings, roughly cutting prior year losses in half. However, the company continued to experience capitalization issues, exacerbating the impact of sustained, although reduced, continuing losses.

10. As of approximately October 2014, the company was out of formula with Huntington Bank, the company's secured lender. As a result, the bank transferred the company's loan to their workout department.

11. As a result of their cash shortages, and lacking any more attractive alternatives, the company also obtained during this period additional funding in the form of merchant financing from Strategic Funding Source, Inc. and Orchard Street Funding, LLC, bringing short term additional liquidity.

12. The timing of the company's cash crisis also coincided with its traditional down cycle of the business (the November through March period).

13. While the company was able to address some of its liquidity issues through short terms financing, the company continues to lack adequate working capital to fund operations, resulting in a current amount of approximately $500,000 in open purchase orders that the company is unable to fulfill.

14. In an effort to continue operations and fund open purchase orders, the company presented various proposals to Huntington Bank, primarily during the month of March, 2013. The company was unable to come to any agreement with Huntington Bank in that regard, necessitating this filing.

15.     With the Debtor's short-term cash issues resolved through this filing and the anticipated Debtor-in-Possession loan, enabling the Debtor to maintain operations as well as fill existing purchase orders, the Debtor now intends to implement a restructuring program through this Chapter 11 case within as short amount of time as possible. As part of this restructuring program, the Debtor also anticipates realizing significant cost savings through a variety of additional operational cost-saving initiatives.

### FIRST DAY MOTIONS

16.     To minimize the adverse effects of the bankruptcy filing on its business, the Debtor has requested "first day" relief (collectively, the "First Day Motions") that are intended to allow the Debtor to maintain its ongoing business operations and fulfill its duties as a debtor-in-possession. I make this Declaration to assist the Court and other parties-in-interest in understanding the circumstances that compelled the Debtor to file the following First Day Motions:

  a.   *First Day Motion for Entry of Interim and Final Order Authorizing the Debtor to Use Cash Collateral, Authorizing Post-Petition Secured Superpriority Financing pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364, Granting Adequate Protection, and Setting a Final Hearing* (the "Cash Collateral and DIP Motion");

  b.   *First Day Motion for Entry of an Order (i) Authorizing Debtor to Pay Employee Obligations and Continue Employee Benefit Programs; (ii) Authorizing Debtor to Pay Certain Pre-Petition Tax Obligations, and (iii) Directing Financial Institutions to Honor Outstanding Employee-Obligation Payments* (the "Wage Motion"); and

  c.   *First Day Motion for Entry of an Order to Continue Using Pre-Petition Account and Forms* (the "Cash Management Motion").

I believe the relief sought in each of the First Day Motions (i) is necessary for the Debtor to make a successful transition to and operate in chapter 11 with minimal interruption or disruption to its

business, (ii) constitutes a key factor in maximizing and preserving the value of the Debtor's estate; and (iii) is therefore necessary to avoid immediate and irreparable harm to the Debtor.

    **I.**    **First Day Motion for Entry of Interim and Final Order Authorizing the Debtor to Use Cash Collateral, Authorizing Post-Petition Secured Superpriority Financing pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364, Granting Adequate Protection, and Setting a Final Hearing (the "Cash Collateral and DIP Motion")**

17. The majority of the Debtor's value arises from its ongoing operations, and its ability to continue servicing its customers. Without authority to use cash collateral, the Debtor will suffer irreparable harm because it will be forced to shut down its operations. Without access to additional funds (*i.e.* DIP borrowing), the Debtor will be unable to pay for basic necessities such as employee wages and benefits, could not be able to obtain all the goods and services needed on a daily basis to operate the Business, also causing the Debtor to suffer irreparable harm because it will be forced to shut down its operations

18. Prior to the Petition Date, the Debtor obtained inventory and other goods from Mitel Networks, Inc. ("Mitel"). Upon information and belief, Mitel may assert a first position lien in all of the proceeds, accounts and contract rights pertaining to inventory the Debtor acquired from Mitel in the approximate amount of $1,934.

19. Upon information and belief, The Huntington National Bank ("Huntington Bank") may assert a second position lien in all of the Debtor's assets in the approximate amount of $1,425,717 arising from a revolving line of credit loan and $1,687,830 arising from a term real estate loan.

20. Upon information and belief, Strategic Funding Source, Inc. ("Strategic Funding") may assert a third position lien in all of the Debtor's assets, except for real state, in the approximate

{00568401.2}
5
15-45364-tjt   Doc 9   Filed 04/06/15   Entered 04/06/15 10:17:34   Page 5 of 17

amount of $272,100.[3]

21.     The Debtor believes that besides Mitel, Huntington Bank and Strategic Funding (collectively, the "Prepetition Secured Creditors") no other entities may assert secured claims in the Debtor's Cash Collateral (as defined below).

22.     The Debtor makes no admission and takes no position at this time regarding the validity, enforceability, priority or perfect of any of the obligations, security interests and liens that may be assert by the Prepetition Secured Creditors or any other secured or unsecured creditors of the Debtor, and reserves all of its rights in that regard.

23.     If the Debtor, during the course of this case and further investigation, discovers that any other entity may claim a security interest in the Cash Collateral, or that any Prepetition Secured Creditor is in fact not a secured creditor, the Debtor will supplement this Motion accordingly, and such entity or entities shall thereafter be included in, or excluded from, as the case may be, the definition of "Prepetition Secured Creditors" as used herein.

24.     As explained above, without a liquidity infusion the Debtor will be unable to meet its ongoing operating expenses, including payroll, causing immediate and irreparable harm to the Debtor, its estate, and its creditors.

25.     Understanding this potential harm to the Debtor, and prior to the decision to seek bankruptcy protection, the Debtor contacted Huntington Bank as well as other potential lenders to pursue various lending options that would give the Debtor sufficient liquidity to operate profitably. The Debtor was unable to reach an agreement with Huntington Bank that would have enabled the Debtor to either borrow, or to consent to the necessary lien waivers and subordinations necessary

---

[3] Capital Quest, Inc. and Capitalist Crusade, LLC, together, wholly own the Debtor, and have also granted Strategic Funding a lien in all of their assets. Both Capital Quest, Inc. and Capitalist Crusade, LLC are majority owned and controlled by Michael J. Woods, the CEO of the Debtor.

for the Debtor to obtain from a different lender, sufficient additional funds to continue to operate and restructure.

26. When it was clear that the Debtor would need to borrow from a lender other than Huntington Bank on debtor-in-possession terms, the Debtor obtained two other proposals from other lenders regarding a debtor-in-possession loan, to ensure that the DIP Agreement was the most favorable agreement available to the Debtor. The Debtor concluded in its business judgment that the DIP Agreement was the most favorable agreement and was most likely to lead to a funding, and furthermore could not identify any lender willing to lend as a debtor-in-possession lender under the Bankruptcy Code on an unsecured, administrative priority basis or secured by a junior lien on some or all of the Debtor's assets. In short, except for the Factoring Facility, the Debtor was unable to identify any other viable opportunity to obtain the financing necessary to effectively reorganize its Business.

27. The Debtor and the DIP Lender, therefore, engaged in arm's length negotiations with respect to the terms and conditions of the DIP Agreement. Significantly, the DIP Agreement permits the DIP Lender to make available up to $750,000.00 (the "Ceiling Amount") in stages: (i) an emergency advance of approximately $500,000[4] to be made immediately upon entry of the Interim Order (the "Emergency Advance") sufficient to satisfy the initial expenses in the Budget, and (ii) subsequent advances as requested by Debtor and agreed to by Lender thereafter up to the Ceiling Amount (the "Later Advances" and together with the Emergency Advance and other indebtedness arising under the DIP Loan Documents, including interest and fees, shall be collectively referred to as the "Post-Petition Advances").

28. The Debtor, with the assistance of its financial advisor, prepared a thirteen week

---

[4] The estimated amount of the Emergency Advance is $498,405, the net proceeds of the factoring of $623,000 of eligible receivables.

cash flow estimate and other financial projections (the "Budget," a copy of which is attached to the Motion as **Exhibit 3**), projecting the Debtor's anticipated revenue and expenses and demonstrates the amount of funds the Debtor must borrow and expend over a 13 week period.[5] The Budget may be updated by the Debtor during the pendency of this case, and the Debtor shall use its Cash Collateral and the Post-Petition Advances in accordance with the Budget for payment of, among other things, (i) post-petition operating expenses and other working capital needs, (ii) the Adequate Protection Payment and fees, costs, and expenses associated with the Factoring Facility, and (iii) other costs and expenses of administration of this case.

29. During the first 4 weeks of this case, to avoid immediate and irreparable harm the Debtor projects that it will need to borrow approximately $500,000 of DIP funds and spend approximately $1,000,000 of Factoring Facility proceeds and Cash Collateral.

30. The Debtor estimates[6] that the value of its assets are:

| Cash | $34,144 |
|---|---|
| Accounts Receivable[7] | $1,159,346 |
| Inventory[8],[9] | $606,493 |
| Machinery & Equipment[10] + Other Assets | $1,494,657 |

---

[5] Note that the Budget estimates that Debtor's cash needs based on a projection, relying in part on projected sales. Therefore, the Debtor's actual performance may vary from the projections in the Budget, depending on the Debtor's actual sales as well as other variables.
[6] The Debtor reserves all of its rights with respect to any estimated values of its assets stated herein. The Debtor is continuing to investigate the value of its assets, and the information set forth herein is without prejudice in that regard, and is not an admission in any way.
[7] Accounts receivable is composed of: $682,352 of current accounts and $476,994 of past due accounts.
[8] Inventory is composed of: $406,739 of finished goods, $135,000 of components, and $65,754 of work-in-progress.
[9] As summarized, Debtor believes that its cash, accounts receivable, and inventory (the "Cash Collateral") has an aggregate value, as of March 30, 2013, of $1,800,983
[10] This value is based on appraised fair market value as of January, 2012. The Debtor may have acquired additional machinery and equipment since that time, and the value of the machinery and equipment may have also changed since 2012.

| Real Estate[11] | $915,000 |
|---|---|
| **Total** | **$4,209,640.00** |

31. The Debtor estimates that the amount of its secured debts[12] are:

| Huntington Bank-Line of Credit | $1,425,717 |
|---|---|
| Strategic Funding | $272,100 |
| Huntington Bank- Real Estate Mortgage | $1,687,830 |
| Mercedes Benz Financial Services | $106,044 |
| **Total** | **$3,491,691.00** |

32. Therefore, based on the Debtor's estimates of its asset values, prior to the approval and funding of the DIP Loans, the Debtor estimates that as of the filing date, an estimated equity cushion exists for the Secured Creditors with a purported interest in the Cash Collateral in the amount of $717,949.

33. Upon the funding of the DIP Loan, the equity cushion will be reduced by the amount of the $623,000 of receivables factored by the priming Emergency Advance, *i.e.* to approximately $95,000, still leaving the Pre-Petition Secured Creditors with a modest equity cushion, which is projected to increase substantially, as explained below and as demonstrated in the Budget.

34. The Emergency Advance, which will prime the existing Collateral as further described above at paragraph 27, and therefore temporarily reduced the equity cushion, are

---

[11] The Debtor's real estate is the land and building located at 1450 Highwood East, Pontiac, Michigan from which it operates. The value is based on the Debtor's net book value. The Real Estate's appraised fair market value, pursuant to an appraisal done on October 29, 2014 is $915,000.
[12] The Mitel alleged secured claim is disregarded, as it will be reduced to zero as and when it receives an product on the Debtor's floor, in the ordinary course of business.

anticipated to be paid off in full by week 11 through the collection of the factored receivables. The Emergency Advance will allow the Debtor to fulfill outstanding purchase orders that the Debtor has previously lacked the cash to fill. The Debtor projects that after the Emergency Advance and the Later Advance,[13] as shown in the Budget, the Debtor will have resolved its liquidity problem, and on a go-forward basis will be operating cash flow positive. Therefore, by the end of week 12, the Debtor projects that its Accounts Receivable balance will be approximately $802,456, with cash of $484,960, and will no longer have any outstanding indebtedness to the DIP Lender that would otherwise prime the Pre-Petition Secured Creditors. Therefore, by week 12, the Pre-Petition Secured Creditors are projected to have adequate liquidity as well as a substantial equity cushion in the amount of approximately $811,875, actually increasing the equity cushion from the Petition Date by $93,926.

## II. First Day Motion for Entry of an Order (i) Authorizing Debtor to Pay Employee Obligations and Continue Employee Benefit Programs; (ii) Authorizing Debtor to Pay Certain Pre-Petition Tax Obligations, and (iii) Directing Financial Institutions to Honor Outstanding Employee-Obligation Payments (the "<u>Wage Motion</u>")

35. By this motion, the Debtor respectfully requests that the Court enter an order (a) authorizing Debtor, in its sole discretion, to pay and honor the Employee Obligations and Employee Benefits (as defined in the motion); (b) directing Debtor's banks and other financial institutions to receive, process, honor, and pay all checks and electronic payments related to the Employee Obligations and Employee Benefits; and (c) permitting the Debtor to change or discontinue and implement new Employee Obligations or Employee Benefits in its sole discretion and without further approval of the Court.

---

[13] The Debtor reserves its right, and is seeking the authority, to request additional Later Advances if required, notwithstanding anything contained herein or in the Budget.

36. The majority of the value of the Debtor's business arises from its ongoing operations. The Employees (as defined below) are instrumental in allowing the Debtor to continue operating as a going concern.

37. As of the Petition Date, the Debtor, employs 104 employees (the "Employees")[14] in the ordinary course of its business and incurs obligations to them for compensation for services. Of the 104 employees, 94 are full time (of which 71 are hourly, 18 are salary, 8 are salary that also receive sales commissions, and 7 are sales commission-only) and 10 are part-time.

38. Four (4) Employees, *i.e.* me, Tracey Woods (my wife), Chris Bonde (Chief Operating Officer), and Peter Bonde (VP, Technology and Sales Engineering) (Chris and Peter are my cousins) are Insiders (as defined in 11 U.S.C. § 101(31)).

39. The Debtor has costs and obligations in respect of the Employees relating to the period before the Petition Date, as set forth specifically below. Certain of these costs and obligations are outstanding and due and payable, while others will become due and payable after the Petition Date in the ordinary course of the Debtor's business.

### WAGES, TAXES AND EXPENSE REIMBURSEMENTS

40. Before the Petition Date, and in the ordinary course of business, the Debtor typically paid obligations relating to wages (the "Wages") (i) for hourly employees, every two (2) weeks on Friday for the two week period ending five days earlier and (ii) for salaried employees, every two weeks for the two week period ending on the payroll date. The Debtor pays the Wages by check.

41. On April 8, 2015, the Debtor will have to fund its payroll processing company, ADP, for the wages to be paid on April 10, 2015 ( the "April 10 Payroll") in an amount estimated

---

[14] The term Employees shall also be deemed to include any former Employees who are still receiving Employee Obligation or Employee Benefit payments, such as, for example, accrued vacation time.

at $150,000.[15] The time period for the April 10 Payroll for hourly employees is March 23 through April 5, 2015, all of which represents prepetition Wages. The time period for the April 10 Payroll for salaried employees is March 28 through April 10, nine days of which are attributable to the pre-petition period.

42. Additionally, the Debtor is required by law to withhold from its Employees' Wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively the "Taxing Authorities").

43. In addition, the Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").

44. The Employees incur various expenses in the discharge of their ordinary duties, such as travel and meal expenses. Because these expenses are incurred as part of their official duties and in furtherance of the Debtor's business, the Debtor reimburses the Employees in full for these expenses (the "Expense Reimbursements"),[16] subject to the submission of proper documentation to the appropriate accounting department.

45. A majority of Expense Reimbursements are travel-related expenses related to sales or client development. The Debtor reimburses expenses on a rolling basis, with a time lag of up to

---

[15] Of this amount, approximately: $994.04 is attributable to me, for payment of Withholding Taxes related to wages for April 10 Payroll already paid pre-petition; $50.000 is attributable to Tracey Woods; $7,932.97 is attributable to Chris Bonde; and $6,341.77 is attributable to Peter Bonde. For subsequent pay periods, my compensation will be $10,500 per pay period.
[16] Expense Reimbursement, Payroll Taxes, Withholding Taxes, and Wages are collectively referred to as "Employee Obligations")

two weeks between submission or the request for reimbursement and payment. It is difficult to determine what Expense Reimbursements that accrued prepetition are outstanding on the Petition Date because of the lag time in the submission of such requests.

### EMPLOYEE BENEFIT PROGRAMS

46. In the ordinary course of its business, the Debtor established certain employee benefit programs (collectively the "Employee Benefits"), including without limitation, paid time off and medical insurance programs.

47. Under its paid time off program (the "PTO Plan"), eligible employees are entitled to receive paid vacation and personal days based on seniority and attendance. Many of the Employees are entitled to unused vacation and personal days based on their prepetition service.

48. Further, the Debtor provides reasonable paid bereavement, jury duty and other similar leave to eligible full-time Employees.

49. Additionally, the Debtor sponsors several health and welfare plans to its employees, including medical insurance.

50. Medical insurance is provided to the Employees through United Health Care. The Debtor pays a portion of the health insurance expenses for all Employees, and the participating Employees pay the remaining balance through deduction from their Wages. The Debtor withholds amounts ranging from $33.23 to $283.40 per month in the aggregate from Employee's Wages on account of medical insurance, which amount is paid monthly together with Debtor's portion (approximately $65,000 per month) to the medical insurer.[17]

51. The Debtor also offers its Employees access to various vision, dental, accidental death and dismemberment insurance, 401(k) and flex spending accounts (the "Supplemental

---

[17] Notwithstanding the above, the full cost of my and my spouse's health insurance, as well as a buy/sell insurance policy, life insurance, as well as other benefits, including automobile expenses, are paid in full by the Debtor.

Benefits"), which are funded entirely through Employee Wage deductions, which are paid monthly to the applicable insurer. The Debtor pays 100% for life insurance with a face value of $15,000 for all Employees.

### WORKERS' COMPENSATION PLANS

52. The laws of the State of Michigan require the Debtor to maintain workers' compensation policies and programs to provide the relevant Employees with coverage for claims arising from or related to their employment with the Debtor (the "Workers' Compensation Programs"). The annual premium for the Debtor's Workers' Compensation policy is approximately $60,000. For the current annual policy, the Debtor paid the down payment of $29,000 in the week prior to the Petition Date, and must pay nine monthly installments for the remaining premium over the next nine months in the amount of approximately $3,500.

53. Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Debtor seeks authority to, in its sole discretion, (i) continue the Workers' Compensation Programs on an uninterrupted basis, consistent with the Debtor's practices prior to the Petition Date, and (ii) make all premium, administrative fee, claim and other payments for obligations related to the Workers' Compensation Programs, including the prepetition amounts described above.

54. As a result of the commencement of the Debtor's Chapter 11 Case, and in the absence of an order of the Court providing otherwise, the Banks may dishonor or reject the Debtor's checks, wire transfers, and direct deposit transfers in respect of the Employee Obligations.

55. The Debtor represents that each of these checks or transfers is or will be drawn on the Debtor's payroll and general disbursement accounts and can be readily identified as relating directly to payment of the Employee Obligations or Employee Benefits. Accordingly, the Debtor

believes that the Banks will not inadvertently honor prepetition checks and transfers other than those for Employee Obligations or Employee Benefits.

### III. First Day Motion for Entry of an Order to Continue Using Pre-Petition Account and Forms (the "Cash Management Motion")

56. Pre-Petition, the Debtor maintained a single, general purpose bank account (the "Account") at the Huntington Bank, its pre-petition secured lender.

57. Approximately seventeen percent (17%) of the Debtor's monthly income is received through credit card payments, which are deposited by the credit card processor, First Data , into the Account.

58. Upon information and belief, it could take up to several weeks to change credit card processors and/or redirect credit card payment from the Account into a new debtor-in-possession ("DIP") account.

59. I believe that the potential delay in receiving credit card payments resulting from either (i) changing credit card processors or (2) the closing the Account and opening a new DIP account for cash collateral will seriously disrupt the company's operations by, among other things, delaying receipt of funds necessary for the continued operation of the business.

60. The company also uses a variety of business forms. In order to minimize expenses to the estate, and to minimize disruption of its business, the Debtor also requests that it be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, stationary, purchase orders, employment applications, invoices, etc.) and checks in the form that they exist immediately prior to the Petition Date (collectively, the "Business Forms"), without reference to the Debtor's status as a debtor-in-possession. Use of new business forms would increase the Debtor's costs and add to the administrative burdens of transitioning to

operations under chapter 11.

61.  In particular, the Debtor proposes the following: the Debtor will maintain its existing Account as it general deposit account, renaming such account a "DIP Account"; the Debtor will provide Huntington Bank with a list of prepetition checks that should not be honored, and the Debtor will open new debtor-in-possession accounts as required by the United States Trustee for taxes and payroll.

Pursuant to 28 U.S.C. § 1746, I declare to the best of my knowledge, under penalty of perjury, that the above statements are true and correct.

Dated: April 6, 2015

Michael J. Woods